IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Shannon M.,[1]     )  C/A No.: 1:21-2865-SVH
           )
     Plaintiff, )
           )
  vs.        )
           )   ORDER
Kilolo Kijakazi, Acting  )
Commissioner of Social Security )
Administration,     )
           )
     Defendant. )
           )

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Sherri A. Lydon, United States District Judge, dated September 15, 2021, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for

_____

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On January 26, 2018, and April 9, 2019, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on October 15, 2017. Tr. at 83, 84, 202–03, 204–12, 213–14. His applications were denied initially and upon reconsideration. Tr. at 143–46, 155–59. On October 21, 2020, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Thaddeus Hess. Tr. at 30–68 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 30, 2020, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 13–29. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 3, 2021. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 44 years old at the time of the hearing. Tr. at 43. He completed high school and obtained a real estate license. Tr. at 44. His past relevant work ("PRW") was as a real estate agent. Tr. at 41. He alleges he has been unable to work since October 15, 2017. Tr. at 202.

2.    Medical History

Plaintiff presented for routine medical evaluation on April 4, 2017. Tr. at 356. His white blood cell ("WBC") count was 14,900/mcL with absolute lymphocytosis of over 7,500. *Id.* A repeat complete blood count ("CBC") on April 18, 2017 showed WBC count of 26,000/mcL, with about 20,000 lymphocytes. *Id.* Plaintiff's hemoglobin, platelet count, mean corpuscular volume, and iron panel were normal. *Id.* His metabolic panel showed elevated glucose at 194 mg/dL and his hemoglobin A1C was high at 6.5%. *Id.*

On May 12, 2017, peripheral blood flow cytometry showed CD5- and CD20-positive lymphocytic population, consistent with chronic lymphocytic leukemia ("CLL"). Tr. at 356.

On May 15, 2017, Plaintiff reported fatigue, but denied weakness and pain. Tr. at 358. Oncologist Mohan C. Thakuri ("Dr. Thakuri") diagnosed Rai

stage 0[2] CLL and discussed Plaintiff's prognosis and possible treatment. Tr. at 359. He noted he had sent molecular studies to determine whether Plaintiff had a more aggressive form of the disease. *Id.*

Plaintiff reported fatigue, but denied weakness and pain on June 12, 2017. Tr. at 349. Dr. Thakuri noted no obvious adenopathy or lymph nodes in the bilateral axillae. Tr. at 346. He stated deletion of Plaintiff's ataxia-telangiectasia-mutated ("ATM") gene placed him in the intermediate risk category. *Id.* He recommended Plaintiff obtain immunoglobulin heavy chain variable region gene ("IgVH") mutational status for additional prognostic information. *Id.* He indicated Plaintiff's WBC count had stabilized and he had no bulky symptoms or adenopathy. *Id.* He stated the available information showed no definite indication to initiate chemotherapy. *Id.* He noted Plaintiff might still have Rai stage 0 CLL. *Id.* Lab studies indicated a WBC count of 27,300/mcL. Tr. at 350.

---

[2] The Rai staging system for CLL consists of low-, intermediate-, and high-risk stages. Lipinscott, Williams & Wilkins, *Cancer: Principles and Practice of Oncology* Ch. 105 (11th ed. Nov. 2018). Rai stage 0 involves low risk and is characterized by lymphocytosis only and two or fewer lymphoid-bearing areas. *Id.* Rai stages I and II involve intermediate risk and are characterized by three or more lymphoid-bearing areas. *Id.* Rai stage I is associated with lymphocytosis and lymphadenopathy. *Id.* Rai stage II involves lymphocytosis and splenomegaly with or without lymphadenopathy. *Id.* Rai stages III and IV are high-risk categories associated with anemia or thrombocytopenia. *Id.* Rai stage III is characterized by lymphocytosis and anemia and Rai stage IV is characterized by lymphocytosis and thrombocytopenia. *Id.*

Plaintiff presented to oncologist Suzanne Reim Fanning, D.O. ("Dr. Fanning"), on July 19, 2017. Tr. at 366. He reported chronic pain related to prior trauma and a recent diagnosis of CLL. *Id.* He denied infections, weight loss, and night sweats. *Id.* Dr. Fanning recorded normal findings on physical exam. Tr. at 366–67. She noted Plaintiff's lab studies had been stable over the prior three months. Tr. at 367. She advised Plaintiff of possible treatment options available if his disease progressed. *Id.*

On September 6, 2017, Plaintiff complained of fatigue and poor sleep, endorsed stable appetite and weight, and denied infectious issues. Tr. at 364. Plaintiff's Eastern Cooperative Oncology Group ("ECOG")[3] score was noted as "1" and his pain was indicated as "0." *Id.* Plaintiff's WBC count was 28,300/mcL. Tr. at 365. Dr. Fanning recorded normal findings on physical

---

[3] The ECOG Scale of Performance Status "describes a patient's level of functioning in terms of their ability to care for themselves, daily activity, and physical ability (walking, working, etc.)." *Franco v. Berryhill*, C/A No. 16-civ-9671, 2017 WL 3034625, at *3 n.3 (S.D.N.Y. July 18, 2017) (citing *ECOG Performance Status*, ECOG-ACRIN Cancer Research Group, http://ecog-acrin.org/resources/ecog-performance-status (last visited July 17, 2017)). The ECOG scale "delineat[es] scores from Grade 0 to 5 and find[s] that Grade 0 means the individual can be '[f]ully active, able to carry on all pre-disease performance without restriction,' Grade 1 means the individual is '[r]estricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light house work, office work,' Grade 2 means the individual is '[a]mbulatory and capable of all selfcare but unable to carry out any work activities; up and about more than 50% of waking hours,' Grade 3 means the individual is '[c]apable of only limited selfcare, confined to bed or chair more than 50% of waking hours,' Grade 4 means the individual is '[c]ompletely disabled; cannot carry on any selfcare; totally confined to bed or chair,' Grade 5 means the individual is '[d]ead.'" *Id.*

exam. Tr. at 364–65. She indicated Plaintiff was coping adequately and had no symptomatic disease. Tr. at 365. She recommended continued surveillance with follow up in three months. *Id.* She also advised Plaintiff to follow up with his primary care physician for an alternative blood pressure medication, to use Melatonin for sleep, and to consider Ritalin for fatigue. *Id.*

Plaintiff denied infectious issues and reported stable appetite and weight and good energy level on December 6, 2017. Tr. at 362–63. Plaintiff's ECOG performance status score was noted as "1" and his pain was indicated as "0." Tr. at 363. Lab studies showed Plaintiff's WBC count to be 28,800/mcL. *Id.* Dr. Fanning recorded normal findings on physical exam. *Id.* She assessed no symptomatic disease and indicated a plan to continue surveillance with follow up in six months. *Id.*

Plaintiff reported progressive lower extremity pain, profound fatigue, and occasional nosebleeds on April 18, 2018. Tr. at 388. He described pain from his hips to his feet and his elbows to his hands that had manifested prior to his diagnosis. *Id.* He rated his pain as a five to six on a 10-point scale. *Id.* He said nosebleeds occurred three times a week and lasted for five minutes at a time. *Id.* He indicated his fatigue was causing slowed memory. *Id.* He reported unintentional weight loss of 10 pounds over the prior four months. *Id.* Nurse practitioner Ellen J. Slater ("NP Slater") assessed

Karnofsky Performance Status of 70%,[4] noting Plaintiff cared for himself, but was unable to carry on normal activity or do active work and an ECOG equivalent of "1." *Id.* She recorded normal findings on physical exam. Tr. at 388. Plaintiff's WBC count was 28,600/mcL. Tr. at 389. NP Slater indicated Plaintiff's CBC count was unchanged and recommended he use saline spray to prevent nosebleeds. Tr. at 388. She ordered a computed tomography ("CT") scan to evaluate for adenopathy or progressive disease. *Id.*

Plaintiff presented to orthopedist Douglas Allen Reeves, Jr., M.D. ("Dr. Reeves"), for evaluation of right knee pain on May 15, 2018. Tr. at 401. He described point tenderness of his patellar tendon and increased pain with certain motions and accidental bumping of the knee. *Id.* He denied swelling. *Id.* Dr. Reeves noted antalgic gait, tenderness to palpation to the mid-body of the patella tendon and at the distal insertion at the tibial tubercle, full relaxion and extension, mild crepitus, no apprehension, no instability, and no posterior knee or calf tenderness. Tr. at 402. X-rays showed possible calcific

---

[4] The Karnofsky Performance Status is "[a] standard way of measuring the ability of cancer patients to perform ordinary tasks," with scores ranging from zero to 100 and higher scores representing better ability to carry out daily activities. *Brown v. Unum Life Insurance Company of America*, 356 F. Supp. 3d 949, 955 n.9 (2019) (citing NCI Dictionary of Cancer Terms, Nat'l Cancer Inst. Of Health, U.S. Dep't of Health and Human Servs., https://www.cancer.gov/publications/dictionaries/cancer-terms/def/karnofsky-performance-status (last visited Jan. 4, 2019)). A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (finding that court may "properly take judicial notice of matters of public record").

tendinitis of the patella tendon. Tr. at 403. Dr. Reeves diagnosed patellar tendinitis, prescribed Relafen 500 mg twice daily, and referred Plaintiff to physical therapy. *Id.*

Plaintiff reported chronic fatigue, lethargy, chronic joint pain, and arthralgias on May 24, 2018. Tr. at 474. Plaintiff's WBC count was elevated at 37,400/mcL. Tr. at 408. Dr. Fanning palpated an approximately 2.5-centimeter right anterior cervical lymph node. Tr. at 475. She prescribed Ritalin twice a day for chronic fatigue and ordered an at-home sleep study with pulse oximeter to rule out obstructive sleep apnea ("OSA") as a source of Plaintiff's fatigue. Tr. at 477. She also recommended over-the-counter glucosamine chondroitin for chronic joint pain. *Id.*

Plaintiff presented to Lloyd Eugene Hayes, Sr., M.D. ("Dr. Hayes"), for evaluation of suspected sleep apnea or narcolepsy with nocturnal hypoxemia on June 15, 2018. Tr. at 494–95. He reported excessive daytime fatigue, lack of energy, and sleepiness that required him to nap for 15 to 90 minutes two or three times a day. Tr. at 495. His wife reported he might fall asleep during a conversation. *Id.* Plaintiff's Epworth Sleepiness Scale was highly positive at 24/24. Tr. at 485, 495. An oxyhemoglobin saturation study showed 21 minutes with oxyhemoglobin saturations of less than 89% and 11.9 minutes with oxyhemoglobin saturations of less than 88%. Tr. at 485, 497. Dr. Hayes assessed OSA and noted some of Plaintiff's symptoms were suggestive of

narcolepsy. Tr. at 497. He ordered an overnight sleep study with continuous positive airway pressure titration and a multiple sleep latency test. *Id.*

Plaintiff continued to endorse profound fatigue that significantly reduced his activity on July 6, 2018. Tr. at 492. He indicated his fatigue made it difficult for him to shop for groceries. *Id.* Dr. Fanning noted Plaintiff was scheduled for a sleep evaluation in October. *Id.* Plaintiff's WBC count was 33,800/mcL. Tr. at 493. Dr. Fanning recorded normal findings on physical exam. *Id.* She assessed high-risk CLL with ATM deletion, disease-associated fatigue, joint discomfort, and adequate psychosocial coping. Tr. at 494. She continued disease surveillance and refilled Ritalin, although Plaintiff reported it provided only mild benefit. *Id.* She wrote: "Unfortunately due to his significant fatigue he has been forced to apply for disability." *Id.*

Plaintiff reported significant improvement in his fatigue on October 12, 2018. Tr. at 490. He stated he was doing well overall, denied night sweats, and endorsed stable weight and appetite. *Id.* He indicated he had planned a trip to Costa Rica. *Id.* His ECOG score was "1" and his pain score was "0." *Id.* Plaintiff's WBC count was 42,500/mcL. Tr. at 491. Dr. Fanning recorded normal findings on physical exam. Tr. at 490–91. She encouraged Plaintiff to receive an influenza vaccine, but he declined. Tr. at 491. She stated continued disease surveillance was appropriate and advised neutropenic precautions to

prevent infection. *Id.* She prescribed Cipro for Plaintiff to use if needed during his upcoming trip to Costa Rica. *Id.*

On April 9, 2019, Plaintiff reported increased knee pain after being more active. Tr. at 489. Dr. Reeves observed no effusion, erythema, warmth, bruising, or obvious deformity. *Id.* He noted 1+ tenderness on the distal patella, but no tenderness elsewhere. *Id.* Plaintiff had mild grinding in the patellofemoral mechanism, but the exam was otherwise normal. *Id.* Updated x-rays showed distal patella tendon calcific tendinitis. *Id.* Dr. Reeves recommended Plaintiff obtain magnetic resonance imaging ("MRI") of his knee and try a patella tendon strap in addition to his physical therapy exercises. *Id.*

Plaintiff presented to nurse practitioner Nancy Smith ("NP Smith") as a new patient on April 10, 2019. Tr. at 570. He reported doing well from a cardiovascular standpoint and requested his hypertensive medication be refilled. *Id.* He complained of fatigue associated with CLL. *Id.* He indicated he typically traveled to Mexico for two to three weeks at a time to undergo a health regimen when his WBC count reached 50,000. *Id.* He endorsed right knee pain, but indicated a brace was helping his pain and range of motion ("ROM"). *Id.* NP Smith noted Plaintiff appeared in acute distress and tired. *Id.* She observed Plaintiff to be obese, to have some enlarged lymph nodes in his right groin area, to have abnormal movement of all extremities, to show

limited ROM of the right knee due to pain, and to have reduced motor strength and generalized motor tiredness. Tr. at 570–71. She assessed CLL in relapse, lethargy, hypertension, and right knee joint pain. Tr. at 571. She ordered lab studies and prescribed Losartan 50 mg for hypertension. *Id.*

Plaintiff reported worsened fatigue on April 12, 2019. Tr. at 486. He indicated he was unable to work secondary to fatigue. *Id.* He said he had spent the winter in Florida and was scheduled for a trip to Mexico for BioCare treatment. *Id.* The record reflects an ECOG score of "1" and a pain level of "0." Tr. at 487. Plaintiff's WBC count was 49,600/mcL. *Id.* Dr. Fanning recorded normal findings on physical exam. *Id.* She indicated Plaintiff did not yet meet criteria for treatment and they would continue with surveillance. Tr. at 488. She requested Plaintiff bring records from his anticipated treatment in Mexico to his next follow up visit. *Id.*

On May 24, 2019, Plaintiff described feeling tired all the time and having pain throughout his body, especially in his legs. Tr. at 568. He said he felt like himself for only three to four hours per day. *Id.* He also reported a clear runny nose, post-nasal drip, and occasional sinus headache. *Id.* He noted his WBC count had decreased and his energy level had slightly increased as a result of the recent treatment he received in Mexico. *Id.* NP Smith observed Plaintiff to appear tired and in distress, to have slightly enlarged and mildly painful lymph nodes in his groin, to demonstrate

abnormal movement of all extremities, to have limited lower extremity ROM due to pain, and to demonstrate reduced strength, generalized weakness, and fatigue on motor exam. Tr. at 569. She assessed CLL in relapse, hypertension, lethargy, allergic rhinitis, esophageal reflux without esophagitis, and obesity due to excess calories. Tr. at 570. She prescribed Omeprazole 40 mg for esophageal reflux, Singulair for allergic rhinitis, and Taurine for energy. *Id.* Lab studies showed Plaintiff's WBC count as 42,600/mcL. Tr. at 569.

On June 27, 2019, Plaintiff reported his fasting and two-hour postprandial blood sugars were around 200 mg/dL. Tr. at 567. He complained of not feeling well, being tired all the time, and having "very bad" pain, mostly in his long bones. *Id.* He admitted to smoking marijuana for nausea and pain and indicated it provided some benefits. *Id.* He endorsed difficulty walking long distances and requested a handicap placard. *Id.* NP Smith noted Plaintiff appeared "in acute distress," was "[v]ery tired," and was lying on the exam table "during the entire visit." *Id.* She recorded tenderness to palpation of Plaintiff's back, mild upper left quadrant abdominal tenderness, abnormal movement of all extremities due to general tiredness and bone pain, limited ROM of the upper and lower extremities, reduced motor strength, generalized weakness, and affect incongruent with mood. Tr. at 567–68. Lab studies showed Plaintiff's WBC count to be 51,400/mcL. Tr. at

568. NP Smith recommended Plaintiff follow a low-carbohydrate diet and increase aerobic exercise and resistance training as tolerated. Tr. at 568. She prescribed Metformin 500 mg twice a day for diabetes and authorized a handicap placard. Tr. at 568, 679.

On July 3, 2019, Plaintiff complained of discomfort in his wrists and legs and significant fatigue. Tr. at 691. He described bone pain in his legs and arms that increased significantly with touch. *Id.* He endorsed some improvement following his last visit to Mexico for treatment, but indicated his WBC count had not significantly changed. *Id.* His ECOG score was "1" and his pain level was "0." *Id.* Dr. Fanning noted no abnormalities on physical exam. Tr. at 692. Plaintiff's WBC count was 58,700/mcL. *Id.* Dr. Fanning prescribed Cymbalta for significant musculoskeletal discomfort and planned to continue surveillance for CLL, as Plaintiff did not meet requirements for treatment. *Id.*

On August 14, 2019, state agency medical consultant Stephen Worsham, M.D. ("Dr. Worsham"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of four hours; sit for a total of about six hours in an eight-hour workday; frequently stoop and balance; occasionally kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; and avoid

concentrated exposure to extreme cold, extreme heat, and hazards. Tr. at 91–93, 101–03. A second state agency medical consultant, Phillip Matar, M.D. ("Dr. Matar"), assessed the same physical RFC at the reconsideration level. *Compare* Tr. at 91–93 *and* 101–03, *with* Tr. at 118–22 *and* 133–37.

Plaintiff presented to the emergency room at Oconee Memorial Hospital for left-sided abdominal pain on August 17, 2019. Tr. at 582. He described constant, sharp pain he rated as a seven. Tr. at 586. Plaintiff's blood pressure was elevated at 153/92 mmHg, his pulse was high at 105 beats per minute, and his respirations were increased at 22 breaths per minute. Tr. at 587. His WBC count was 60,200/mcL. *Id.* Chest x-rays and a CT scan of Plaintiff's abdomen and pelvis showed no acute abnormalities. Tr. at 588–90. An increased number of lymph nodes in Plaintiff's lower chest, abdomen, and pelvis and splenomegaly were consistent with his history of CLL. Tr. at 590. Physician assistant Hayli Evans prescribed a muscle relaxer and Norco for severe breakthrough pain and instructed Plaintiff to rest. Tr. at 590.

Plaintiff presented with tongue swelling on August 27, 2019. Tr. at 680. He indicated he had sustained two bee stings to the back of his neck and had not had access to his EpiPen. *Id.* NP Smith ordered steroid and Benadryl injections. Tr. at 681.

On September 23, 2019, Dr. Fanning noted Plaintiff had experienced lymphadenopathy three weeks prior that had resolved. Tr. at 666. Plaintiff

reported feeling fatigued and indicated he had recently had a fever for two weeks. *Id.* He wanted to review his WBC count before leaving on a trip to Costa Rica and Mexico. *Id.* Plaintiff's ECOG score was "1" and his pain level was "0." Tr. at 667. His WBC count was 78,300/mcL. *Id.* Dr. Fanning recorded no abnormalities on physical exam. *Id.* She acknowledged Plaintiff's WBC count was increasing, but indicated he did not yet meet criteria for treatment. *Id.* She prescribed Cipro in case Plaintiff developed an infection while on vacation and refilled Cymbalta. *Id.*

Plaintiff also followed up with NP Smith on September 23, 2019. Tr. at 682. He indicated he planned to leave for Costa Rica in two days, spend several weeks in Costa Rica, and subsequently travel to Mexico for natural treatments. *Id.* He indicated he continued to feel tired all the time, although not quite as tired as he had felt during his last visit. *Id.* NP Smith noted reduced motor strength and generalized fatigue. Tr. at 683. She observed Plaintiff to be lethargic. *Id.* She assessed leukocytosis secondary to steroids and noted Plaintiff's WBC count was extremely elevated. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on October 21, 2020, Plaintiff testified he had worked as a real estate agent and maintained an ownership interest in the real estate

agency. Tr. at 41. He stated he had spent the majority of a typical workday in his office and had lifted a maximum of 10 pounds. Tr. at 42.

Plaintiff said he lived with his wife, his three daughters, and his wife's daughter. *Id.* He testified he was 5'10" tall, weighed between 200 and 202 pounds, and was right-handed. Tr. at 43–44.

Plaintiff stated he had injured his waist, hip, and abdomen when he was hit by a pickup truck in 2010. Tr. at 44. He indicated he had subsequently obtained his real estate license because he needed light work that would provide an income. Tr. at 45. He said he recently underwent lower bowel surgery to remove an adhesion and experienced complications following the surgery. Tr. at 44–45.

Plaintiff testified he initially noticed symptoms related to his CLL diagnosis in 2014 or 2015, but it was not diagnosed until 2017. Tr. at 45. He said he had cancerous WBCs. Tr. at 46. He indicated it caused him fatigue and pain. Tr. 46, 47. He described pressure-like pain in his bones from his shoulders through his arms and his hips through his legs. Tr. at 47. He said the pressure caused his bones to feel as if they would explode. Tr. at 48. He stated his doctors had previously prescribed heavy opioid medications, including Oxycontin, Lortab, and Morphine, that had been ineffective and made him feel loopy and unable to think straight. Tr. at 48–49. He said he experienced extreme fatigue such that he required multiple naps throughout

the day. Tr. at 49. He noted simple tasks like carrying in the groceries increased his fatigue. *Id.* He denied having received chemotherapy. *Id.* He stated he had stopped seeing the oncologist who diagnosed CLL because he felt he was pushing medication on him. Tr. at 50. He indicated Dr. Fanning, his current treating oncologist, had respected his desire to put off treatment as long as possible. Tr. at 51. He noted he had started a clinical trial of a drug in February that had provided some relief, but had also potentially led to his abdominal problems. *Id.*

Plaintiff testified he sought alternative treatment for CLL in Mexico. Tr. at 50–51. He explained he received coffee enemas each morning during the three-week treatment programs. Tr. at 52–53. He indicated the providers pumped Ozone 3 into his rectum to attack the cancer cells. Tr. at 52. He stated the program focused on nutrition and attempted to balance the chemicals in his body. Tr. at 53. He said when he first attended the program, his fatigue was so heavy and his mind so foggy that he could not carry on a conversation. *Id.* He noted he improved after eight or nine days such that he could call home and speak with his children. *Id.* He indicated the treatment was only recommended every six months and he had attended the program on four occasions. Tr. at 53–54. He said he returned for treatment when he felt mentally clogged. Tr. at 54. He noted the first treatment had provided

nine weeks of improvement, but more recent treatment had only offered three or four weeks of improvement. *Id.*

Plaintiff testified that on a typical day, he would get up, drink coffee, sit on the porch and relax, and perform a small task like preparing breakfast. *Id.* He said he would then need to lie down for 30 minutes to an hour because he would feel "zonked." *Id.* He stated he would nap two to three times a day for 30 minutes to an hour-and-a-half at a time. Tr. at 55. He said he could stand for a maximum of 30 minutes and could not often walk around or climb steps. *Id.* He indicated he could walk into and out of a store, but had to use the motorized cart while shopping. *Id.* He said he typically carried in lightweight grocery items. Tr. at 56. He admitted he could lift heavier items, but it would increase his pain. *Id.* He indicated he experienced pain in his arms and legs all the time. *Id.*

Plaintiff admitted ibuprofen was the only medication he was taking for pain. Tr. at 57. He testified he also smoked a total of two ounces of marijuana per month for pain relief and indicated it helped more than any medication he had tried. *Id.* He clarified that he smoked a quarter teaspoon of marijuana about eight times a day. Tr. at 60. He said his oncologist and his doctors in Mexico had recommended it. Tr. at 57. He explained that he had started using marijuana a year prior and it had improved his quality of life. Tr. at 57–58. He said that prior to starting the marijuana, he was spending the

majority of the time in the bed, had not driven for a year-and-a-half, and was not even going to the grocery store. Tr. at 58. He stated he now drove for six or eight miles at a time and had seen "big improvement," although he did not feel he was able to perform a job. *Id.* He indicated his pain level was only rarely below a five, but may decrease from an eight to a six or a seven to a five with use of marijuana. Tr. at 60. Plaintiff denied smoking marijuana prior to his diagnosis, aside from "a little bit" as a teenager. Tr. at 62.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Kim Williford reviewed the record and testified at the hearing. Tr. at 64–67. The VE categorized Plaintiff's PRW as a real estate agent, *Dictionary of Occupational Titles* ("*DOT*") No. 250.357-018, requiring light exertion and a specific vocational preparation ("SVP") of 5. Tr. at 65. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work, requiring lifting or carrying 10 pounds occasionally and five pounds frequently, standing and walking two hours in an eight-hour workday, and sitting six hours in an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; and should avoid concentrated exposure to extreme cold and heat and workplace hazards, such as unprotected heights and moving machinery. *Id.* The VE testified that the hypothetical individual would be unable to perform

Plaintiff's PRW, but could perform sedentary jobs with an SVP of 2 as an order clerk, *DOT* No. 209.567-014, a document specialist, *DOT* No. 249.587-018, and a call operator, *DOT* No. 237.367-014, with 9,000, 19,000, and 7,000 positions in the national economy, respectively. Tr. at 66.

For a second hypothetical question, the ALJ asked the VE to consider the individual would be expected to miss three days of work per month. *Id.* He asked if any jobs would be available. Tr. at 67. The VE stated the restriction would preclude competitive employment. *Id.*

For a third hypothetical, the ALJ asked the VE to consider the individual would be off-task for 20% of the time due to fatigue and side effects of medication. *Id.* He asked if there would be any jobs. *Id.* The VE testified that being off-task 15% or more of the time would be work-preclusive. *Id.*

### 2.    The ALJ's Findings

In his decision dated November 30, 2020, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2022 (12D).

2.    The claimant has not engaged in substantial gainful activity since October 15, 2017, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.) (7D–12D, hearing testimony).

3.    The claimant has the following severe impairments: chronic lymphocytic leukemia, right patella tendinitis, obesity, and diabetes mellitus (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work (lift/carry 10 pounds occasionally and five pounds frequently; stand or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday), as defined in 20 CFR 404.1567(a) and 416.967(a) except with the following limitations: he can never climb ladder/rope/scaffolds. He can occasionally climb ramp/stairs, balance, stoop, kneel, crouch, and crawl. He should avoid concentrated exposure to extreme cold, extreme heat, and workplace hazards such as unprotected heights and moving machinery.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on November 23, 1975 and was 41 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 18–24.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly evaluate symptoms related to CLL in assessing his RFC; and

2)    the ALJ failed to adequately assess hid subjective allegations as to his symptoms.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting

"need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h.)

a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331

F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

    Plaintiff raises two allegations of error, but these issues are more appropriately considered together, as he maintains the ALJ did not adequately consider his subjective allegations and other evidence as to the limiting effects of CLL in assessing his RFC. [ECF No. 19 at 11–23]. He argues the ALJ did not comply with SSR 96-8p in considering the effects of symptoms that include severe fatigue, impaired memory and concentration, shortness of breath on exertion, and extreme sleepiness. *Id.* at 11–17. He maintains the ALJ did not comply with SSR 16-3p in evaluating his subjective allegations as to his symptoms, as he failed to consider the full record in assessing the consistency of his statements, imposed an improper legal standard by requiring his symptoms be fully supported by the medical evidence, failed to explain which of his statements were inconsistent with the other evidence, and regarded his trips to Mexico and Costa Rica for alternative medical treatment as evidence contrary to his statements. *Id.* at 17–23. He contends his pain, fatigue, and related symptoms would cause him

to be off-task for a significant portion of a workday and affect his ability to concentrate, persist, or maintain pace. *Id.* at 13–14.

The Commissioner argues substantial evidence supported the ALJ's RFC assessment and that he appropriately considered and accounted for pain and fatigue imposed by CLL in assessing an RFC for a reduced range of sedentary work. [ECF No. 21 at 7–16]. She maintains Plaintiff has failed to provide a reasoned argument to support his claim that the ALJ's function-by-function analysis was improper. *Id.* at 7. She claims the ALJ considered the state agency consultants' opinions, Dr. Fanning's findings, and Plaintiff's activities of daily living ("ADLs"), including his travel, in accordance with 20 C.F.R. § 404.1529(c), in concluding Plaintiff was not as limited as he stated. *Id.* at 9–15.

The claimant's residual functional capacity ("RFC") represents the most he can still do, despite limitations imposed by his impairments and symptoms. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC assessment must be based on all the relevant evidence in the case record. SSR 96-8p, 1996 WL 374184, at *2. The ALJ must be mindful of the claimant's ability to meet the physical, mental, sensory, and other requirements of work on a regular and continuing basis, meaning "8 hours a day, for five days a week, or an equivalent work schedule.". 20 C.F.R. §§ 404.1545(a) (4), (b), 416.945(a)(4), (b); SSR 96-8p, 1996 WL 374184, at *1.

A claimant's statements are among the evidence an ALJ must consider and resolve in assessing the RFC. SSR 96-8p, 1996 WL 374184, at *7. Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). If the evidence supports a finding that the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms at the first step, he is "entitled to rely exclusively on subjective evidence to prove" his symptoms are "so continuous and/or so severe that [they] prevent [him] from working a full eight hour day" at the second step. *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). The ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). He must explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2017 WL 5180304, at *8.

The ALJ must include a narrative discussion explaining the restrictions included in the RFC assessment. SSR 96-8p, 1996 WL 374184, at *7. The narrative discussion should reference specific medical facts, such as

medical signs and laboratory evidence, and non-medical evidence, including daily activities and observations" and "must explain how any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.* Accordingly, "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636.

The ALJ assessed Plaintiff's RFC and noted evidence supporting it as follows:

> The claimant's chronic lymphocytic leukemia limits him to sedentary work (lift/carry 10 pounds occasionally and five pounds frequently; stand or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday); never climb ladder/rope/scaffolds; occasionally climb ramp/stairs, balance, stoop, kneel, crouch, and crawl. His related symptoms such as pain, fatigue, and nausea, as seen on some exams, limit him to avoid concentrated exposure to extreme cold, extreme heat, and workplace hazards such as unprotected heights and moving machinery. The claimant is not further limited based upon the following objective evidence.
>
> In April 2017, was diagnosed with chronic lymphoma leukemia (CLL), a cancer of the blood and bone marrow, with symptoms including fatigue, enlarged spleen, and enlarged liver (1F). June 2017 oncology diagnoses included Rai stage 0 chronic lymphocytic leukemia, moderate aggressive disease. CT scan showed enlarged nodes in bilateral axilla/mediastinum. Notes show that the bilateral axillary adenopathy was assessed and is not pathologic (1F, 7F/8).
>
> Regarding treatment and medication, the claimant has taken ibuprofen for his pain (see e.g. 18E). The claimant has opted against chemotherapy and has sought natural treatment in Mexico. He has been to Mexico on several occasions to receive this

treatment, but related medical records are unavailable (2F/2, 8F, 10F). June 2019 primary care notes show that the claimant requested a disabled handicap placard, which was prescribed by Nancy Smith, FNP (11F/3–4). However, recent oncology notes suggest that the Mexico visits actually help. July 2019 oncology notes state that he "went to Mexico for Biocare treatment. He reports there was no significant change in his [white blood count], but had some improvement" (see e.g. 15F/8).

April 2018 notes show that pulmonary function studies were normal. Chest x-ray was clear except for some hilar and small mediastinal lymph nodes. Previous chest and abdominal CT showed mediastinal and hilar lymphadenopathy (9F/3, see also 9F/52).

In August 2019, the claimant sought ER treatment for increasing left-sided abdominal pain. Chest x-ray was normal. CT of the abdomen and pelvis showed increased number of lymph nodes consistent with history of chronic lymphocytic leukemia; and hepatomegaly and hepatic steatosis (1F/12–14, 15F,6–7). Lab showed elevated white blood count, lipase, and glucose. Notes state that findings were consistent with CLL. He was given Norco for breakthrough pain, muscle relaxer, and instructed to take ibuprofen or Tylenol for pain (12F/10–44).

July 2019 primary care exam showed that he was in acute distress, was very tired, and laid on the exam table during the entire visit. His back had tenderness to palpation. Abdomen had mild tenderness in the upper left quadrant. It was noted that "due to the general tiredness and bone pain, he had limited range of motion of upper and lower extremities." Strength was reduced due to generalized weakness (11F/3–4). September 2019 primary care exam showed that his neurological motor strength was reduced due to generalized fatigue (14F/12–13).

July and November 2019 oncology exams showed that he had no adenopathy, lymphadenopathy, or edema. November 2019 notes show that lab show his white blood count was increasing, but he did not meet criteria for treatment (anemia, thrombocytopenia, bulky LA or rapidly doubling ALC) (15F/8–9, 13F/11–14). Finally, notes consistently showed ECOG Performance Score of 1 and

pain score of 0 (see e.g. 1F/13, 2F/3, 4, 4F/3, 7F/27, 29, 37, 39, 48, 52, 62, 66, 9F/4, 7, 10, 16, 20, 13F/13, 15F/8).

Tr. at 20–21. The ALJ considered the opinions of state agency consultants Drs. Worsham and Matar persuasive, although he included additional restrictions. Tr. at 22.

The ALJ's explanation for his RFC assessment fails to comply with the narrative discussion requirement in SSR 96-8p. Although the ALJ cited evidence he claimed to support the RFC he assessed, he did not explain how the evidence supported the specific restrictions he included in the RFC assessment and failed to support further restrictions. In *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), the court emphasized that an ALJ must provide a logical explanation as to how he weighed the record evidence and arrived at his RFC finding. It indicated "a proper RFC analysis has three components: (1) evidence; (2) logical explanation; and (3) conclusion." *Id.* It noted the logical explanation is just as important as the evidence and conclusion and considered it error for the adjudicator to merely list evidence and state a conclusion. *Id.*

In contravention of SSR 96-8p and Fourth Circuit precedent, the ALJ's decision generally reflects a conclusion and a listing of evidence without an explanation as to how the evidence leads to the conclusion. In particular, the ALJ did not explain how restrictions in the RFC assessment for avoiding concentrated exposure to extreme cold, extreme heat, and workplace hazards

adequately accommodated Plaintiff's pain, fatigue, and nausea. He acknowledged NP Smith's July and September 2019 observations of physical manifestations of pain and fatigue, but did not explain why the evidence did not support additional breaks during the workday or other accommodations for pain and fatigue. The ALJ referenced Plaintiff's ECOG Performance Scale scores, but he did not explain how they were consistent with the RFC he assessed and inconsistent with further restrictions. He considered Drs. Worsham's and Matar's opinions persuasive, but only provided a conclusory reason, stating they were "supported by the longitudinal evidence in the record." Tr. at 22.

The ALJ found Plaintiff's impairments could reasonably be expected to cause some of his alleged symptoms, but concluded his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the evidence. Tr. at 20, 22. He wrote:

> [N]o one inconsistency or conflict described above is dispositive. However, viewed as a whole, because the claimant's statements about the intensity, persistence, and limiting effects are inconsistent with the objective medical evidence and the other evidence, I find that the claimant's symptoms are less likely to reduce his capacities to perform work-related activities (20 CFR 404.929(c)(4) and 416.929(c)(4)).

Tr. at 22.

Interestingly, the ALJ's decision includes no specific references to Plaintiff's hearing testimony or subjective allegations as to the limiting

effects of his impairments. He failed to acknowledge or address Plaintiff's reports to his medical providers of pain and fatigue throughout the record. *See* Tr. at 349, 358, 364, 366, 388, 474, 486, 492, 495, 567, 568, 570, 666, 691. He did not cite Plaintiff's testimony that pressure-like pain in his bones from his shoulders through his arms and his hips through his legs caused his bones to feel as if they would explode. Tr. at 47–48. He did not reference Plaintiff's allegation that he required two to three 30- to 90-minute naps per day due to extreme fatigue from minimal exertional activities like preparing breakfast or carrying in lightweight grocery items. Tr. at 49, 55. The ALJ wrote only: "The claimant alleges disability based upon leukemia, neuropathy, fatigue, and hypertension (see e.g. 3D, 5E–7E, 12E, 17E–19E, hearing testimony)." Tr. at 20. Thus, nowhere in his decision did the ALJ identify Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms that he found inconsistent with the other evidence of record. Because the ALJ failed to identify Plaintiff's statements, it was impossible for him to adequately consider whether they were consistent with the other evidence of record in accordance with 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4) and SSR 16-3p.

The ALJ addressed Plaintiff's ADLs, writing:

[I]n May, June 2019, January 2020, the claimant indicated that he performed self-care, did not drive, and that his wife did most of the housework and cooking (5E, 6E, 7E, 12D). However, throughout the longitudinal record, notes show that the claimant

traveled abroad to Costa Rica and Mexico, where he stayed for "natural treatments" (see e.g. 2F/2, 9F/2, 3, 7–8, 11F/3–7, 13F/12, 14F/7, 10, 12, 15F/3, 8). Finally, at the October 2020 hearing, the claimant gave testimony regarding his reduced ADLs.

Tr. at 22.

The Fourth Circuit has noted "[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). When an ALJ considers a claimant's ADLs as inconsistent with his statements, the ALJ must also consider the claimant's qualifying statements as to how he performed those ADLs and adequately explain how the referenced ADLs support a conclusion that he can complete an eight-hour workday. *See Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 99 (4th Cir. 2020).

In the absence of an explanation from the ALJ, it is unclear how the referenced ADLs are inconsistent with Plaintiff's statements as to the effects of his symptoms. The ALJ does not explain how Plaintiff's ability to perform self-care and travel to Costa Rica and Mexico for "natural treatments" disprove his allegations that pain and fatigue prevented him from completing an eight-hour workday. He further failed to reconcile evidence that Plaintiff did not drive, relied on his wife to do most of the housework and cooking, and engaged in reduced ADLs, which would presumably be consistent with his allegations.

The ALJ addressed Plaintiff's pain, medication, and treatment, noting: "June 2019 notes show that the claimant reported a nine-month history of using marijuana for pain and nausea. Because of this, he was not offered narcotic pain medications (11F/3–4)." Tr. at 22. The ALJ appears to have found Plaintiff's complaints of pain inconsistent with his treatment. However, in reaching this conclusion, he did not address Plaintiff's explanation or explain how this evidence was inconsistent with Plaintiff's allegations as to his pain. Plaintiff testified he had previously used heavy opioid medications, including Oxycontin, Lortab, and Morphine, that had been ineffective and made him feel loopy and unable to think straight. Tr. at 48–49. He stated using marijuana allowed him to get out of bed and reduced his pain from an eight to a six or a seven to a five, but did not reduce his pain sufficiently for him to work. Tr. at 58–60.

In *Patterson v. Commissioner of Social Security Administration*, 846 F.3d 656, 663 (4th Cir. 2017), the court noted the dispute "arises from a problem that has become all too common among administrative decisions challenged in this court—a problem decision makers could avoid by following the admonition they have no doubt heart since their grade-school math classes: Show your work." The court has reviewed the ALJ's RFC assessment and his explanation and cannot discern why he imposed the specified restrictions and declined to impose additional restrictions that were arguably

supported by some evidence of record. Therefore, substantial evidence does not support the ALJ's RFC assessment.

## III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

March 15, 2022
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge